<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

VINCENT D. BAKER,

               Plaintiff,

     v.

BOROUGH OF TINTON FALLS *et al.*,

            Defendants.

Civ. No. 18-5707

**OPINION**

<u>THOMPSON, U.S.D.J.</u>

## **INTRODUCTION**

This matter comes before the Court upon the Motion for Summary Judgment filed by Defendants Borough of Tinton Falls, Tinton Falls Police Department, Officer James Sapia, Officer Christopher Whalen, Chief of Police John Scrivanic, and Sergeant Anthony Turso (collectively, "Defendants"). (ECF No. 32.) Plaintiff Vincent D. Baker ("Plaintiff") opposes. (ECF No. 34.) The Court has decided the Motion based upon the written submissions of the parties and without oral argument, pursuant to Local Civil Rule 78.1(b). For the reasons stated herein, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## **BACKGROUND**

### I.    **Initial Stop by Officer Whalen**

On February 10, 2017, Plaintiff, a 72-year old male, was driving with two female passengers in a vehicle with tinted windows. At approximately 4:17 P.M., Officer Whalen signaled for Plaintiff to pull over, and Plaintiff complied. (Whalen MVR at 16:17:20–30, Defs.'

Ex. C, ECF No. 32-6.)[1] Officer Whalen and Plaintiff exited their vehicles, and Plaintiff provided

Officer Whalen with his documents. (*Id.* at 16:18:00.) Officer Whalen explained that he pulled

Plaintiff over because his vehicle had tinted windows, and informed Plaintiff that he had an

active traffic warrant for $500. (*Id.* at 16:18:10–16:19:45.) Plaintiff and Officer Whalen engaged

in an extended discussion over whether Plaintiff had already paid the warrant. (*Id.* at 16:19:45–

16:27:58.) While waiting on confirmation that the warrant was still active, Officer Whalen

obtained the identification of the other passengers in the vehicle and checked whether they had

any active warrants. (*Id.* at 16:25:37–16:26:30; Whalen Dep. 46:16–47:3, 76:5–12, Defs.' Ex. D,

ECF No. 32-7.) Officer Whalen eventually received confirmation that Plaintiff had merely paid

the DMV restoration fee and not the warrant, and informed Plaintiff that he would have to come

to the police station and post bail. (Whalen MVR at 16:27:33–58.) Officer Whalen permitted

Plaintiff to ask the passengers for money to post bail and to leave behind any of his belongings.

(*Id.* at 16:29:06–16:30:50.) Officer Whalen testified that, throughout this encounter, Plaintiff was

fully cooperative and was "calm" and "a gentleman." (Whalen Dep. 47:12–19.)

 As Plaintiff emptied his pockets into the driver's seat of his vehicle—out of view of

Officer Whalen's MVR—Officer Whalen told Plaintiff to "hold on" and to turn towards him.

(Whalen MVR at 16:32:20.)[2] Officer Whalen testified that he saw a cut straw fall from

Plaintiff's pocket, which he interpreted to be drug paraphernalia. (Whalen Dep. 51:7–52:1.)

Plaintiff disputes that a straw fell out of his pocket. (Pl.'s Resp. to SUMF ¶ 4, ECF No. 34.)

Plaintiff initially turned toward Officer Whalen but repeatedly pleaded "wait" and to "please, let

---

[1] The Court's summary of the traffic stop is largely based on the two Mobile Video Recordings ("MVRs") from Officer Whalen's and Officer Sapia's police vehicles.
[2] At this point onwards, Officer Whalen's MVR only shows Plaintiff and Officer Whalen from the shoulders up, such that their hands and lower body are not visible.

me get my medication." (Whalen MVR at 16:32:30–50.) Officer Whalen testified that Plaintiff

pulled his hands away from Officer Whalen and tried to reach back into his pockets. (Whalen

Dep. 52:2–53:11.) Officer Whalen then grabbed Plaintiff and pushed him against the side of

Plaintiff's car. (Whalen MVR at 16:32:53–16:33:05.) Officer Whalen ordered Plaintiff to place

his hands on top of the vehicle, and Plaintiff complied. (*Id.* at 16:33:07.) Officer Whalen agreed

that once Plaintiff's hands were on top of the vehicle, the situation was safer to deal with.

(Whalen Dep. at 53:15–54:8.)

  While Officer Whalen held Plaintiff against the car, he called for backup. (Whalen MVR

at 16:33:10.) After Officer Whalen called for backup, Plaintiff appeared to stand calmly with his

hands on top of the vehicle for about fifteen seconds. (*Id.* at 16:33:11–26.) Subsequently,

Plaintiff began to move his body around, while still pinned against the vehicle, and Officer

Whalen instructed him to stop moving. (*Id.* at 16:33:27.) Plaintiff seemed to comply, and Officer

Whalen then called for "64" to "step it up." (*Id.* at 16:33:35.) Officer Whalen testified that "64"

referred to Officer Sapia, and that he said "step it up" because he "anticipat[ed] that [Plaintiff]

was going to further resist control and possibly fight me." (Whalen Dep. 82:14–25.) About ten

seconds later, Plaintiff appears to remove his hands from the top of the vehicle. (Whalen MVR at

16:33:45.) Plaintiff then began leaning to his left away from the vehicle, and Officer Whalen,

standing behind Plaintiff, attempted to push him back against the car. (*Id.* at 16:33:48–16:34:06.)

  Throughout the interaction between Officer Whalen and Plaintiff, Officer Whalen had his

own police canine in his vehicle. Officer Whalen testified that he could have deployed his canine

by using the "door popper" attached to his belt, but that he did not feel that such action was

necessary. (Whalen Dep. at 83:12–86:16.) Officer Whalen confirmed that he did not specifically

request Officer Sapia to deploy his K-9. (*Id.* at 83:1–16.)

3

## II.     Intervention by Officer Sapia

Officer Sapia responded to Officer Whalen's call for backup. Officer Sapia testified that he knew Plaintiff had a warrant for his arrest, but that he did not know anything else about the situation. (Sapia Dep. 21:2–22:23, Defs.' Ex. H, ECF No. 32-11.) When Officer Sapia arrived on the scene, Plaintiff was pressed against the vehicle with Officer Whalen standing behind him. (Whalen MVR at 16:34:06.) Officer Sapia testified that both of their backs were towards him, but he observed Officer Whalen trying to grab Plaintiff's arms and asserts that Plaintiff was resisting arrest by refusing to give up his hands. (Sapia Dep. 18:8–19, 28:2–15.) Officer Whalen recounts that he was holding onto the forearms of Plaintiff's jacket in an attempt to keep his hands on top of the vehicle. (Whalen Dep. 55:16–56:1, 59:3–11.) When Officer Sapia arrived, Officer Whalen says that he ordered Plaintiff to put his hands behind his back, but Plaintiff did not comply. (*Id.* at 60:16–61:8.) Plaintiff admits that he was "passively struggling with Defendant Whalen by not giving up his hands." (Pl.'s Resp. to SUMF ¶ 16, 29.)

The MVR shows that Officer Sapia immediately exited his vehicle, retrieved his police dog ("K-9 Hunter") on leash, and ran toward Officer Whalen and Plaintiff. (Whalen MVR at 16:34:07–14.) Officer Sapia initially ordered K-9 Hunter to "heel." (Sapia MVR at 16:34:11.)[3] Just as Officer Sapia approached, Plaintiff's body movements appear to stop, although his hands are out of view of either MVR. (Whalen MVR at 16:34:10–15; Sapia MVR at 16:34:10–15.)[4] Officer Sapia then commanded K-9 Hunter to "get him," and K-9 Hunter lunged at Plaintiff.

---

[3] Defendants assert that "heel" is the command to move to the left side of the officer. (Defs.' SUMF ¶ 18.)

[4] Initially, Officer Sapia's MVR only captures the right half of Officer Whalen and Plaintiff from behind. Although Plaintiff's hands are out of view, the Incident Report prepared by Sergeant Turso states that Officer Whalen "appeared to be holding the arms of the subject." (Incident Report at 2, Defs.' Ex. J, ECF No. 32-13.)

(Sapia MVR at 16:34:14.)[5] From the time Officer Sapia exited his vehicle to the time he ordered K-9 Hunter to apprehend Plaintiff, only seven seconds had passed. (Whalen MVR at 16:34:07–14.) Officer Sapia testified that he did not give a warning to Plaintiff before deploying K-9 Hunter, even though such a warning would have only taken five seconds, because Plaintiff was actively resisting arrest and "had his hand closed," such that Officer Sapia did not know if Plaintiff had a weapon. (Sapia Dep. 51:18–52:18.)

As K-9 Hunter jumped on Plaintiff, Plaintiff used his right hand to grab heroin and medication from his shirt pocket and put it in his mouth. (Whalen MVR at 16:34:17; Pl.'s Dep. at 21:2–22:3, Defs.' Ex, E, ECF No. 37-8.) Officer Whalen immediately grabbed Plaintiff's mouth to prevent him from swallowing the drugs. (Whalen MVR at 16:34:18.) As Officer Whalen struggled to remove the drugs from Plaintiff's mouth, Officer Sapia again ordered K-9 Hunter to "get him," and K-9 Hunter jumped on Plaintiff's left side. (Sapia MVR at 16:34:21–28.) Officer Sapia then ordered Officer Whalen to "back up" so that K-9 Hunter could better apprehend Plaintiff. (*Id.* at 16:34:30; Sapia Dep. at 41:8–42:4.) K-9 Hunter then jumped on Plaintiff's back several times as Officer Whalen held onto Plaintiff's right side. (Sapia MVR at 16:34:38–42.) The MVR does not clearly show whether K-9 Hunter bit Plaintiff as he jumped.

Officer Whalen then pulled Plaintiff to the ground. (Whalen MVR at 16:34:41.) As Plaintiff fell to the ground, K-9 Hunter bit his left arm for three seconds. (*Id.* at 16:34:42–45.) At that point, Officer Whalen ordered Officer Sapia to back up. (*Id.* at 16:34:45–48.) K-9 Hunter continued to bite Plaintiff's arm for two more seconds until Officer Sapia pulled him back. (*Id.* at

---

[5] Defendants assert that "get him" is the command to apprehend. (Defs.' SUMF ¶ 18; Sapia Dep. 39:15–40:13.) At this point, K-9 Hunter is out of view of both of the MVRs, such that it is not clear if K-9 Hunter bit plaintiff immediately.

16:34:46–48.) Officer Whalen then handcuffed Plaintiff. Throughout the incident, the two passengers traveling with Plaintiff did not leave the vehicle.

### III.      Resulting Charges and Injuries

After Plaintiff was handcuffed, the police officers inspected Plaintiff's vehicle and recovered a number of drugs and drug paraphernalia. (Defs.' SUMF ¶¶ 22, ECF No. 32-1.) They also recovered a "small miniature baseball bat." (*Id.* ¶ 23.) Plaintiff was charged with three counts of third degree possession of a controlled dangerous substance (cocaine and heroin), fourth degree resisting arrest, fourth degree tampering with physical evidence, and fourth degree unlawful possession of a weapon. (Compl. ¶ 22.) Plaintiff ultimately pleaded guilty to third degree possession of a controlled dangerous substance and resisting arrest as a disorderly persons offense. (*Id.* ¶ 23; Pl.'s Resp. to SUMF ¶ 24.) Resisting arrest as a disorderly persons offense does not involve the use or threat of use of force. (*Id.*)[6]

The Tinton Falls Police Department investigated the incident and concluded that Officer Sapia's use of K-9 Hunter was justified because he was "attempting to overcome resistance directed at him, as well as in the protection of [Officer Whalen]." (Defs.' SUMF ¶ 30 (citing Incident Report at 3, Defs.' Ex. J, ECF No. 32-13).)

Following his arrest, Plaintiff was brought to the Jersey Shore Medical Center, where he was diagnosed with a left upper extremity contusion and a dog bite injury. (Pl.'s Ex. H, ECF No. 34-3.) Plaintiff still has physical scars on his arm and back from the dog bite injuries. (Pl.'s Dep. 106:10–23; Pl.'s Ex. C, ECF No. 34-1.)

---

[6] Third degree resisting arrest requires that the person "[u]ses or threatens to use physical force or violence against the law enforcement officer." N.J. Stat. Ann. § 2C:29-2(a). Meanwhile, resisting arrest as a disorderly persons offenses requires that the person "purposely prevents or attempts to prevent a law enforcement officer from effecting an arrest." *Id.*

**IV.      Use of Force and K-9 Procedures**

Both parties provide a copy of the Tinton Falls Police Department's K-9 Operations and

Procedures (Pl.'s Ex. D, ECF No. 34-2) and Use of Force Procedures (Pl.'s Ex. D1, ECF No. 34-

2). The Use of Force Procedures describe the various categories of force that an officer may use.[7]

(Use of Force Procedures at 19, Pl.'s Ex. D1.)[8] An officer may use physical force or mechanical

force when the officer reasonably believes it is immediately necessary to "overcome resistance

directed at the officer," to protect the officer or a third party from unlawful force, or to make an

arrest. (*Id.* at 20.) However, the "degree of force employed in any situation should be only that

[which is] reasonably necessary." (*Id.* at 18.)

According to the K-9 Procedures, "the deployment of police canines to effectuate lawful

arrests should only be considered when the use of force would be justified in effectuation of the

arrest." (K-9 Procedures at 3, Pl.'s Ex. D.)[9] The K-9 Procedures provide that,

> When feasible, the handler shall allow the suspect(s) the opportunity to surrender
> by giving a warning announcement prior to deploying their canine for a Physical
> apprehension. An example of such an announcement is as follows: "POLICE,
> YOU ARE UNDER ARREST. STOP OR I WILL RELEASE MY POLICE
> DOG, AND HE WILL BITE YOU."

(*Id.* at 7.) Once the canine has apprehended the suspect, "[t]he handler will immediately advise

the suspect to stop fighting and/or resisting the canine, and the handler will command the canine

to release the suspect." (*Id.*) Furthermore, "upon arrival at all suspected disorderly persons

offenses and/or crime scenes or situations, [the responding officer] shall immediately assess the

---

[7] The categories of force are: (1) physical contact, which includes routine or procedural contact;
(2) physical force, which includes wrestling, arm locks, or hand-to-hand confrontation; (3)
mechanical force, which includes using a baton, canine physical contact, or chemical agent
spraying; and (4) deadly force, which includes firing a firearm in the direction of a person or
building. (Use of Force Procedures at 19.)
[8] The page numbers to which the Court refers are the CM/ECF page numbers.
[9] The page numbers to which the Court refers are the CM/ECF page numbers.

situation to determine if the K-9 unit could be beneficial to the investigation." (*Id.* at 11.) The K-9 Procedures mirror the New Jersey Attorney General's Guidelines. (Turso Dep. 13:9–18, Defs.' Ex. O, ECF No. 32-18.)

Defendants also submit a report from Thomas B. Conroy, a use-of-force expert who specializes in the use of police dogs. (Conroy Report, Defs.' Ex. K, ECF No. 32-14.) Mr. Conroy is a retired police officer who served as a police dog handler and/or trainer for over twenty years. (*Id.* at 11–12.)[10] Based on a review of the MVRs and other exhibits in this case, Mr. Conroy opined that the use of force by both Officers Whalen and Sapia was proper and in compliance with the policies of the Tinton Falls Police Department and New Jersey law. (*Id.* at 9–10.)

## V.      Procedural History

On April 9, 2018, Plaintiff filed a Complaint alleging four counts: (1) excessive force in violation of the Fourth Amendment against Officers Sapia and Whalen (Compl. ¶¶ 24–27), (2) municipal liability against Defendant Borough of Tinton Falls (*id.* ¶¶ 28–35), (3) supervisory liability against Chief of Police John Scrivanic and Sergeant Turso (*id.* ¶¶ 36–45), and (4) violations of the New Jersey Constitution and/or New Jersey Civil Rights Act (*id.* ¶¶ 46–49).[11] Plaintiff seeks compensatory and punitive damages as well as attorney's fees and costs. (*Id.* at 11.) On March 13, 2020, after the close of discovery, Defendants filed the present Motion for Summary Judgment. (ECF No. 32.) On May 21, 2020, Plaintiff filed an Opposition. (ECF No.

---

[10] The page numbers to which the Court refers are the CM/ECF page numbers.

[11] Plaintiff does not explicitly allege any claims against Defendant Tinton Falls Police Department. The Court notes that a police department is "merely an administrative arm of the local municipality," and therefore the Tinton Falls Police Department cannot be sued in conjunction with the municipality. *Padilla v. Twp. of Cherry Hill*, 110 F. App'x 272, 278 (3d Cir. 2004).

8

34.) On May 28, 2020, Defendants filed a Reply. (ECF No. 35.) Defendants' Motion for Summary Judgment is now before the Court.

## **LEGAL STANDARD**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party," and is "material" if it will "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; instead, all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

In resolving a motion for summary judgment, a district court considers the facts drawn from "the pleadings, the discovery and disclosure materials, and any affidavits." *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002) (internal quotations omitted). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. The Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In qualified immunity cases, the Supreme Court has noted that the existence of a videotape recording presents an "added wrinkle" to the general requirement that courts construe

9

facts in the light most favorable to the non-moving party. *Scott*, 550 U.S. at 378. In that regard, "[w]here there is a video recording of the relevant events, the Court views the facts as depicted in the recording, rather than in the non-movant's favor, whenever the recording 'blatantly contradict[s]' the non-movant's version such that 'no reasonable jury could believe it.'" *Knight v. Walton*, 660 F. App'x 110, 112 (3d Cir. 2016) (quoting *Scott*, 550 U.S. at 380–81).

## DISCUSSION

### I.   Excessive Force Claims Against Officers Whalen and Sapia

In Count One of the Complaint, Plaintiff asserts that Officers Whalen and Sapia used excessive force, in violation of the Fourth Amendment. (Compl. ¶¶ 24–27.) Specifically, Plaintiff challenges Officer Sapia's action of "releasing his dog to bite Plaintiff" and Officer Whalen's action of "taking Plaintiff to the ground." (Opp'n at 6, ECF No. 24.) Defendants move for summary judgment, arguing that the force was objectively reasonable, and even if such force was not reasonable, that the officers are nevertheless entitled to qualified immunity. (Mot. for Summ. J. at 13–24, ECF No. 32-2)

"Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007). The doctrine of qualified immunity shields government officials who perform discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of qualified immunity is to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id.* "To resolve a claim of qualified immunity, courts engage in a two-pronged inquiry: (1) whether the plaintiff sufficiently

alleged the violation of a constitutional right, and (2) whether the right was 'clearly established' at the time of the official's conduct." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). District courts have "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson*, 555 U.S. at 236. The Court will first consider whether Officer Whalen and/or Officer Sapia violated Plaintiff's constitutional rights, and subsequently, whether that right was clearly established.

> A.    *Constitutional Violation*

In an excessive force case, a court determines whether a constitutional violation has occurred using the Fourth Amendment's objective reasonableness test. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Curley*, 499 F.3d at 206–07. To determine objective reasonableness, courts must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)) (internal quotation marks omitted). The Supreme Court has cautioned that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396–97.

While this inquiry is highly individualized and fact-specific, the Supreme Court in *Graham* provided three factors to guide the Court's inquiry: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the police or others, and (3) whether the suspect is actively attempting to resist arrest or flee the scene. *Id.* at 396. The Third Circuit has also provided additional factors for consideration, including

11

> the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

S*harrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). The Court evaluates objective reasonableness from the perspective of the officer at the time of the incident and not with the benefit of hindsight. *Maryland v. Garrison*, 480 U.S. 79, 85 (1987). In sum, the Court employs a "totality of the circumstances" approach for evaluating objective reasonableness. *Curley*, 499 F.3d at 207.

The Third Circuit has held that the "[u]se of a police dog to bite and hold a suspect is not per se unreasonable." *Moore v. Vangelo*, 222 F. App'x 167, 170 (3d Cir. 2007) (citing *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994); *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 150 (1st Cir. 2003)). Instead, the Court recognized that although "'police dogs can—and often do—cause serious harm,' *Vera Cruz v. City of Escondido*, 139 F.3d 659, 661 (9th Cir. 1997), the use of K-9 force to apprehend suspects where the *Graham* factors weigh in favor of the police is reasonable." *Id.* The Court will thus assess each of the *Graham* factors to determine whether Officers Sapia and Whalen acted reasonably.

1.   Crime Factor

Construing all facts in favor of the non-moving party, a reasonable jury could find that the severity of the crime factor weighs in Plaintiff's favor. Plaintiff was pulled over for driving a vehicle with tinted windows and for an outstanding warrant due to unpaid traffic tickets. These are both non-violent motor vehicle offenses. Officer Sapia testified that he was only aware of the warrant when he deployed K-9 Hunter. (Sapia Dep. at 21:2–22:23.) Officer Whalen testified that in addition to the tinted windows and warrant, he suspected that Plaintiff had drugs in his possession because he had been driving in a known narcotics area and because he allegedly saw

a cut straw fall from Plaintiff's pocket. (Whalen Dep. at 40:15–41:7, 51:7–17.) Plaintiff, however, contests that a cut straw fell from his pocket. (Pl.'s Resp. to SUMF ¶ 4.) Ultimately, Plaintiff pleaded guilty to third degree possession of heroin and a disorderly persons offense of resisting arrest. (Defs.' SUMF ¶ 24; Pl.'s Resp. to SUMF ¶ 24.)

Plaintiff was not suspected or convicted of any violent crimes, and therefore a reasonable jury could find that the first *Graham* factor weighs in Plaintiff's favor. *Compare Santini v. Fuentes*, 975 F.3d 410, 419 (3d Cir. 2015) (finding that the crime factor could weigh in the plaintiff's favor where he was charged with fourth degree aggravated assault but only pleaded guilty to a disorderly persons offense of resisting arrest); *Monticciolo v. Robertson*, 2017 WL 4536119 (D.N.J. Oct. 11, 2017) (finding crime factor could weigh in the plaintiff's favor where officers used K-9 to apprehend plaintiff who was suspected of drunk driving), *with Chaudry v. Farabella*, 2020 WL 3542299, at *7 (D.N.J. June 30, 2020) (granting summary judgment in favor of police officers where a K-9 was deployed in response to a burglary, and the suspect had stolen a gun from the home's safe and was hiding in the basement); *White v. City of Lagrange, Ga.*, 952 F. Supp. 2d 1353, 1358 (N.D. Ga. 2013) (finding the crime factor weighed against plaintiff where plaintiff was suspected of armed robbery and actively fled the police). Therefore, a reasonable jury could conclude that Plaintiff's crime factor only warranted a lesser use of force.

2.   Immediate Threat

The second *Graham* factor considers whether the suspect posed an immediate threat to the safety of the officers or others. The Court finds that there are material facts in dispute regarding whether Plaintiff posed an immediate threat, and that a reasonable jury could find that this factor weighs in Plaintiff's favor. Plaintiff was seventy-two years old at the time of the incident. He was not suspected of committing a violent offense. Plaintiff and Officer Whalen

engaged in a lengthy conversation, during which time Officer Whalen described him as calm and

cooperative. (Whalen Dep. 47:12–19.) While Plaintiff is seen moving his body while pinned

against the car (Whalen MVR at 16:33:44–16:34:14), once Officer Sapia approaches, Plaintiff

movements appear to stop (*Id.* at 16:34:14). The MVRs do not clearly depict Plaintiff's or

Officer Whalen's hands, and the parties provide differing descriptions of Plaintiff's actions.

Defendants characterize Plaintiff's movements as an attempt to escape (Defs.' SUMF ¶

9), which Plaintiff disputes (Pl.'s Resp. to SUMF ¶ 9). When Officer Sapia arrived, Plaintiff

asserts that he was standing facing the car with his hands on the roof. (*Id.* ¶ 15.) Plaintiff admits

that he was "passively struggling" with Officer Whalen by "not giving up his hands." (*Id.* ¶ 16.)

Officer Whalen, by contrast, claims that Plaintiff was "actively struggling" by trying to pull

away from him and remove his hands from the top of the car. (Whalen Dep. 60:16–61:8.) Officer

Sapia testified that he perceived a threat because Plaintiff was "actively resisting arrest," Plaintiff

had his hand closed, and he did not know whether Plaintiff had a weapon. (Sapia Dep. 52:9–18.)

Based on the above, the Court finds that there is a material factual dispute as to what

Plaintiff was doing with his hands when Officer Sapia decided to deploy K-9 Hunter, and

whether a reasonable officer would have perceived Plaintiff as an immediate threat at that time.

Construing all facts in Plaintiff's favor, a reasonable jury could find that, despite Plaintiff's

noncompliance at several points in his interaction with Officer Whalen, this noncompliance did

not indicate that Plaintiff posed an immediate threat to either officer's safety. *Compare Vangelo*,

222 F. App'x at 171 (finding an immediate threat where "[t]he melee going on before [the

officer] was an ongoing assault," and the officer was outnumbered three-to-one) *with*

*Monticciolo*, 2017 WL 4536119, at *9 (denying summary judgment where there was a dispute as

to whether the plaintiff reached for his waistband while partially restrained by two officers);

*Santini*, 795 F.3d at 420 (finding that a reasonable jury could conclude that the plaintiff's failure to obey the officer's orders to keep his hands in his pockets did not warrant the use of pepper spray, in light of the "absence of other facts suggesting that [the plaintiff] was armed or otherwise posed a threat to officer safety").

### 3.   Resisting Arrest or Fleeing

The third *Graham* factor considers whether Plaintiff was resisting arrest or fleeing when the force was used. The MVRs demonstrate that Plaintiff refused to comply with Officer Whalen's orders at several points: Plaintiff ignored Officer Whalen's orders to stop moving, refused to keep his hands on top of the vehicle, and eventually ingested the heroin in his pocket. However, Plaintiff maintains that these actions were passive and nonviolent. (Pl.'s Resp. to SUMF ¶ 16, 24.) In *Santini*, the Third Circuit found the third *Graham* factor inconclusive where the plaintiff admitted to resisting arrest but did so nonviolently. 795 F.3d at 420. However, the plaintiff in *Santini* merely refused to take his hands out of his pocket, whereas Plaintiff was physically struggling with Officer Whalen. Still, Defendants admit that Plaintiff did not at any time attempt to assault either officer. (Turso Dep. 34:10–13.) Taken together, the Court finds that this factor leans slightly in favor of the Officers.

### 4.   *Sharrar* Factors

Under the additional *Sharrar* factors, the first factor considers whether Plaintiff was dangerous; as noted above, a reasonable jury could find that Plaintiff did not pose an immediate threat to the officers. Regarding the duration of the action, K-9 Hunter was deployed for approximately thirty seconds, although he only appeared to bite Plaintiff a few seconds at a time within that period. A reasonable jury may find that the brief use of K-9 Hunter signifies that his deployment was unnecessary. *See Monticciolo*, 2017 WL 4536119, at *10 (finding that because

15

the K-9 only bit plaintiff for three seconds, "a reasonable jury could conclude that the use of a canine was wholly unnecessary to effectuating the arrest"). However, a jury may conversely find that the short duration of the bites weighs in Officer Sapia's favor, because he did not gratuitously prolong the attack. *See Castellani v. Atlantic City*, 2017 WL 3112820, at *13 (D.N.J. July 21, 2017) (highlighting fact that officer allowed K-9 to attack plaintiff for two minutes as evidence that force was excessive). The Court thus finds this factor inconclusive as to Officer Sapia. Meanwhile, Officer Whalen's use of force—bringing Plaintiff to the ground—was brief and non-gratuitous, weighing in his favor

Third, the officers used force in the context of effectuating an arrest, which generally weighs in favor of the officers. However, as noted above, this arrest was for a nonviolent crime, warranting lesser force. Fourth, a reasonable jury could conclude that it was unreasonable for the officers to believe that Plaintiff was armed. Both officers testified that they did not know if Plaintiff was armed (Whalen Dep. 52:15–53:8; Sapia Dep. 33:14–21, 52:9–18), and provide no basis to support the belief that he was armed. The final *Sharrar* factor considers the "number of persons with whom the police officer must contend at one time." *Sharrar*, 128 F.3d at 822. Initially, the encounter between Officer Whalen and Plaintiff was one-on-one, potentially justifying Officer Whalen's use of force. However, when Officer Sapia deployed K-9 Hunter, there were two officers present to apprehend one suspect. A reasonable jury could find that this situation did not warrant the use of a K-9. *Cf. Vangelo*, 222 F. App'x at 171 (finding use of K-9 justified where the officer was outnumbered three to one). Although there were two passengers in the car, they never left the vehicle during the encounter.

5.   Conclusion

Altogether, the *Graham* and *Sharrar* factors demonstrate that, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that Officer Sapia's use of K-9 Hunter to apprehend Plaintiff was objectively unreasonable. Although Plaintiff was not fully cooperating, and K-9 Hunter's attack was brief, a jury could find that (i) the use of a K-9 was excessive in relation to Plaintiff's nonviolent crimes, (ii) Plaintiff did not pose an immediate threat to the officers, especially since he was outnumbered, and (iii) it was unreasonable for Officer Sapia to assume Plaintiff was armed.

Meanwhile, the only use of force by Officer Whalen that Plaintiff challenges was "taking Plaintiff to the ground." (Opp'n at 6.) The Court finds that Officer Whalen's use of physical—rather than mechanical—force was objectively reasonable in order to effectuate the arrest and in response to Plaintiff's failure to fully comply with Officer Whalen's orders. Accordingly, summary judgment is granted in favor of Officer Whalen on Count One of the Complaint.

B.   *Clearly Established Right*

At step two, "[the Court] inquires whether—even [if] an officer violated an individual's constitutional right—immunity should still protect that officer from liability." *Santini*, 795 F.3d at 417–18 (citing *Curley*, 499 F.3d at 207). To answer that question, the Court must determine whether the right violated by the officer was "clearly established" at the time of the violation. *Id.* (citing *Curley*, 499 F.3d at 207; *Saucier v. Katz,* 533 U.S. 194, 202 (2001)). To make that determination, the Court engages in another reasonableness inquiry: "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier*, 533 U.S. at 202). Like the reasonableness inquiry conducted in step one, this inquiry is objective and fact specific. *Id.* Despite these similarities, the step two inquiry is distinct from the

inquiry conducted in step one; the purpose of the step two inquiry is to acknowledge the reality that "reasonable mistakes can be made as to the legal constraints on particular police conduct." *Curley*, 499 F.3d at 207 (quoting *Saucier*, 533 U.S. at 205) (internal quotation marks omitted).

While a case directly on point is not required to show that a right is clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). Stated differently, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001). "Such precedent must come either from the Supreme Court or a 'robust consensus of cases of persuasive authority in the Court of Appeals.'" *In re J & S Props., LLC*, 872 F.3d 138, 143 (3d Cir. 2017) (quoting *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016)). The clearly established law should not be defined "at a high level of generality," but rather must be "particularized" to the facts of the case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citations omitted).

The Supreme Court has emphasized that, whenever possible, courts should rule on qualified immunity "early in the proceedings so that the costs and expenses of trial are avoided." *Saucier*, 533 U.S. at 200. However, the Third Circuit recognized that "the imperative to decide qualified immunity issues early in the litigation is in tension with the reality that factual disputes often need to be resolved before determining whether the defendant's conduct violated a clearly established constitutional right." *Curley*, 298 F.3d 271, 278 (3d Cir. 2002). Therefore, while it is for the court to decide whether an officer's conduct violated a clearly established constitutional right, "the existence of disputed, historical facts material to the objective reasonableness of an

officer's conduct will give rise to a jury issue." *Id.* (citing S*harrar v. Felsing*, 128 F.3d 810, 828 (3d Cir. 1997); *Karnes v. Skrutski*, 62 F.3d 485, 499 (3d Cir.1995)).

At the outset, the Court notes that the factual dispute as to whether Plaintiff posed an immediate threat to the officers is material to the question of qualified immunity, such that ruling on qualified immunity at this juncture would be premature. Nevertheless, the Court will consider whether, viewing the facts in the light most favorable to Plaintiff, Officer Sapia's use of force violated a clearly established right. Under this standard, the question presented is whether it was clearly established that it would violate the Fourth Amendment for an officer, responding to a call to "step it up," to order a K-9 to bite a suspect without warning, where the suspect was being held against a car by another officer and posed no immediate threat to the officers' safety, but was not fully complying with the officers' orders. The Court finds that, at the time of Officer Sapia's conduct, if Plaintiff did not pose an immediate threat to the officers' safety, it was established that deploying a K-9 under those circumstances would violate the Fourth Amendment's prohibition against excessive force.

As this District found in *Monticciolo*, it is clearly established that "once an arrestee stops resisting or attempting to flee, and ceases to pose a safety threat, using a police dog to apprehend the arrestee constitutes excessive force." 2017 WL 4536119, at *15 (denying qualified immunity where officer ordered a police dog to apprehend the plaintiff "who, at the time the command was given, was immobilized in the prone position by two officers with his left arm fully restrained, was outnumbered four to one by police officers, and was neither resisting arrest nor a flight risk"); *see also Castellani*, 2017 WL 3112820, at *14–15 (finding that it was clearly established that releasing a K-9 without warning to bite an unarmed, non-threatening individual who was immobilized and outnumbered by police officers violated the Fourth Amendment); *Cooper v.*

19

*Brown*, 844 F.3d 517, 524–25 (5th Cir. 2016) (affirming denial of qualified immunity where arrestee "was not attempting to resist arrest or flee, and [the officer] had no reason to think that he posed an immediate threat"); *Rainey v. Patton*, 534 F. App'x 391, 395–97 (6th Cir. 2013) (concluding that it would be clear to a reasonable officer that employing a police dog against an unarmed suspect detained on the basis of a traffic offense, who was on the ground and not attempting to flee, would constitute excessive force); *Edwards v. Shanley*, 666 F.3d 1289, 1296 (11th Cir. 2012) (finding it objectively unreasonable to allow a police dog to bite a suspect for five to seven minutes where the suspect had ceased fleeing, was lying on his stomach with his hands exposed, and had verbally surrendered). Accordingly, assuming Plaintiff did not pose an immediate safety threat to the officers, the Court could find that Officer Sapia violated Plaintiff's clearly established rights under the Fourth Amendment.

Officer Sapia's failure to issue a warning is an additional factor that may weigh against qualified immunity. The Third Circuit has declined to hold that "the deployment of a dog without a verbal warning is per se objectively unreasonable," citing to the fact that even in cases of deadly force a warning is not always required. *Vangelo*, 222 F. App'x at 170 n.2 (citing to *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985), which held that an officer may use deadly force when a suspect "threatens the officer with a weapon . . . *if, where feasible, some warning has been given*") (emphasis in original). The Third Circuit thus acknowledged that there may be exceptional circumstances in which an officer may not have the opportunity to issue a warning before using force. This acknowledgment does not override the "general rule . . . that absent a threat to his safety, a police officer must warn a suspect before releasing a dog upon him." *Grady v. Becker*, 907 F. Supp. 2d 975, 980 (D. Minn. 2012) (citing *Kuha v. City of Minnetonka*, 365 F. 3d 590, 599 (8th Cir. 2003), *abrogated in part on other grounds by Szabla v. City of Brooklyn*

*Park, Minn.*, 486 F.3d 385, 396 (8th Cir. 2007)) (noting that "there may be exceptional cases where a warning is not feasible"); *Vathekan v. Prince George's Cty.*, 154 F.3d 173, 179 (4th Cir. 1998) (overturning grant of qualified immunity because "it was clearly established . . . that failing to give a verbal warning before deploying a police dog to seize someone is objectively unreasonable and a violation of the Fourth Amendment"); *see also Campbell v. City of Springboro, Oh.*, 700 F.3d 779, 789 (6th Cir. 2012) (finding officer "acted contrary to clearly established law when he used an inadequately trained canine, without warning, to apprehend two suspects who were not fleeing"). Based on the above, if Plaintiff did not pose an immediate safety threat, then the Court could find that it was feasible for Officer Sapia to issue a warning prior to deploying K-9 Hunter, and that Officer Sapia thereby violated Plaintiff's clearly established right to a warning prior to being attacked by a police dog.

Ultimately, the Court finds that because a material dispute of fact exists as to whether it was reasonable for Officer Sapia to view Plaintiff as an immediate safety threat when he deployed K-9 Hunter, a decision on qualified immunity would be premature. Accordingly, the Court denies summary judgment as to Count One of the Complaint against Officer Sapia.

## II.   Municipal Liability

Count Two of the Complaint asserts a claim against Defendant Borough of Tinton Falls ("Borough") for its alleged failure to train, supervise, and discipline its police officers. (Compl. ¶¶ 28–35.) Because the Court has found that Officer Sapia may have acted with excessive force in violation of the Fourth Amendment, the Court must determine whether the Borough is liable for that violation. *See Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004). The Court must review the municipal liability claim "independently of the section 1983 claims

against the individual police officers." *Id.* (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).

The Supreme Court has held that a municipality can only be held liable under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). Where the policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "[T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Canton*, 489 U.S. at 390. Municipal liability may attach where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* Additionally, "the deficiency in training [must have] actually caused" the constitutional violation. *Canton*, 489 U.S. at 391.

Ordinarily, a finding of deliberate indifference requires "[a] pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). However, "in certain situations, the need for training can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights even without a pattern of constitutional violations." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (citing *Canton*, 489 U.S. at 390 n.10). Liability in single-incident cases

22

depends on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Id.* at 223–24 (citing *Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 409 (1997)). As an example, the Supreme Court noted that where "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons," the need to train officers in the constitutional limitations on the use of deadly force is "so obvious" that failure to provide such training could provide a basis for single-incident liability. *Id.* (quoting *Canton*, 489 U.S. at 390 n.10).

Plaintiff argues that the Borough was "on constructive notice that its police officers were engaged in the practice or custom of using excessive force on citizens" and failed to fulfill its duty to "prevent, penalize, and cure" such abuses. (Compl. ¶ 30–31.) Plaintiff does not present a pattern of such violations, but rather relies on the facts of the current case to demonstrate deliberate indifference.[12] The Court agrees that the need for use of force training and police canine training is so obvious that failure to provide such training would amount to deliberate indifference. *See Canton*, 489 U.S. at 390 n.10. However, the Tinton Falls Police Department does provide trainings on these topics. (*See* Defs.' Ex. S, ECF Nos. 32-22, 32-23, 32-24 (documenting Officer Sapia's trainings on use of force and K-9 handling while employed by the Tinton Falls Police Department); Sapia Dep. 13:5–15:1.) The record demonstrates that Officer Sapia and K-9 Hunter were trained by Captain Gerald Turning and Defendant Turso, both certified K-9 trainers. (Turso Dep. 13:19–15:7; Sapia Dep. 12:1–13:4.) Furthermore, training records show the industry standard for the amount of time for basic training in accordance with the N.J. Attorney General's Guidelines. (Conroy Report ¶ 35; *see* Attorney General's K-9

---

[12] The Complaint cites to two other lawsuits against Officer Sapia as evidence of a pattern of excessive force violations. (Compl. ¶ 33.) However, neither of those cases resulted in a final determination as to whether Officer Sapia used excessive force.

Guidelines, Defs.' Ex. M, ECF No. 32-16.) Officer Sapia and K-9 Hunter have been certified for several years with the United States Police Canine Association (Conroy Report ¶ 37), and Officer Sapia receives follow-up training twice per month (Turso Dep. 15:18–16:3; Sapia Dep. 14:16–15:1).

Having established that these training programs are in place, the question is whether these training programs were so clearly deficient that they could amount to deliberate indifference by the Borough. Plaintiff does not clearly articulate the deficiencies in Officer Sapia's training, although he seems to suggest that Officer Sapia was inadequately trained to (i) use physical force before resorting to mechanical force, and (ii) give a warning before deploying a K-9 to apprehend a suspect. (Opp'n at 13–14.) However, the Tinton Falls Police Department's procedures appear to align with the type of training that Plaintiff seeks. The Use of Force Procedures state that the "degree of force employed in any situation should be only that [which is] reasonably necessary." (Use of Force Procedures at 18.) The Procedures further state that an officer "may use physical force or mechanical force when the officer reasonabl[y] believes it is immediately necessary to . . . overcome resistance . . . or . . . to make an arrest." (*Id.* at 20.) Additionally, the K-9 Procedures mirror the Attorney General's Guidelines. (Turso Dep. 13:9–18.) Before using physical or mechanical force, officers are instructed to, "where feasible, ask the person to desist." (K-9 Procedures at 4.) Additionally, "[w]*hen feasible*, the handler shall allow the suspect(s) the opportunity to surrender by giving a warning announcement prior to deploying their canine." (*Id.* at 7 (emphasis added).) Officer Sapia testified that he was aware of the warning requirement but believed that it was not feasible to give a warning in this case. (Sapia Dep. 51:9–24.)

24

Accordingly, it appears that Plaintiff has not indicated any deficiency in the Tinton Falls Police Department's training program other than the potential excessive force used by Officer Sapia. As the Supreme Court held in *Canton*, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city." 489 U.S. at 390–91. Additionally, "adequately trained officers occasionally make mistakes," and otherwise sound training programs may occasionally be "negligently administered," but neither of these situations warrant municipal liability. *Id.* Ultimately, because Plaintiff's failure-to-train claim against the Borough appears to be grounded solely in the single incident of Officer Sapia's alleged excessive force, his claim must fail. Accordingly, the Court grants summary judgment in favor of Defendant Borough of Tinton Falls as to Count Two of the Complaint.

## III.    Supervisory Liability of Defendants Scrivanic and Turso

Count Three of the Complaint asserts supervisory liability against Defendants Scrivanic and Turso for alleged failure to train, supervise, and discipline the Tinton Falls police officers. (Compl. ¶¶ 36–45.) A plaintiff cannot hold a supervisor liable for the actions of his employees solely on a *respondeat superior* theory under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). However, supervisors can be held liable if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused the constitutional harm." *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010) (citing *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)) (internal quotation marks omitted). Plaintiff's allegations against Defendants Scrivanic and Turso mirror the allegations against the Borough. For the same reasons that this Court granted summary judgment on Count Two of the Complaint, the Court also grants summary judgment in favor of Defendants Scrivanic and Turso on Count Three of the Complaint.

IV.     **New Jersey State Violations**

Count Four of the Complaint alleges violations under the New Jersey Civil Rights Act ("NJCRA") that are the same as the federal constitutional claims at issue. (Compl. ¶¶ 46–49.) The NJCRA "creates a private cause of action for violations of civil rights secured under the New Jersey Constitution[]." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011); N.J. Stat. Ann. § 10:6–2. Courts in New Jersey consistently look at claims under the NJCRA "through the lens of § 1983." *Monticciolo*, 2017 WL 4536119, at *20 (collecting cases). In the context of a claim for excessive force during an arrest, the standard under the New Jersey Constitution is the same as that under the United States Constitution. *Norcross v. Town of Hammonton*, 2008 WL 9027248, at *4 (D.N.J. Feb. 5, 2008). Accordingly, the Court will interpret Plaintiff's NJCRA claims analogously to his § 1983 claims. *Trafton*, 799 F. Supp. 2d at 443–44. The Court has held that Officer Whalen's use of force did not violate the Fourth Amendment, and therefore Officer Whalen is entitled to summary judgment on Plaintiff's NJCRA claim. As for Officer Sapia, for the same reasons the Court denied summary judgment on the federal excessive force claim in Count One, the Court also denies summary judgment on the state excessive force claim in Count Four.[13] Therefore, Plaintiff's NJCRA claim for excessive force may proceed against Officer Sapia only.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 32) is

---

[13] Although New Jersey has a qualified immunity doctrine, this doctrine "tracks the federal standard," *Brown v. State*, 165 A.3d 735, 743 (N.J. 2017) (quoting *Morillo v. Torres*, 117 A.3d 1206, 1215 (N.J. 2015)), such that, for the same reasons a ruling on federal qualified immunity would be premature, a ruling on state qualified immunity would likewise be premature.

granted in part and denied in part. An appropriate Order will follow.


Date: <u>September 4, 2020</u>                    <u>*/s/ Anne E. Thompson*        </u>
                                               ANNE E. THOMPSON, U.S.D.J.

27